# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNESTINE F. STROBEL Individually and as Trustee of the Strobel Charitable Remainder Unitrust Dated 11/29/00,<br><br>                    Plaintiff,<br>  vs.<br><br>MORGAN STANLEY DEAN WITTER, et al.,<br><br>                    Defendants. | CASE NO. 04cv1069-BEN (BLM)<br><br>ORDER DENYING PETITION TO VACATE ARBITRATION AWARD; DENYING CROSS PETITION TO CONFIRM ARBITRATION AWARD AND REMANDING WITH INSTRUCTIONS |

## I.  INTRODUCTION

Now before the Court is the Petition to Vacate Arbitration Award filed by Ernestine F. Strobel Individually and as Trustee of the Strobel Charitable Remainder Unitrust Dated 11/29/00 (hereinafter "Plaintiff") and the cross Petition to Confirm the Arbitration Award filed by Morgan Stanley Dean Witter and Suzanne LaTour (hereinafter "Defendants").  Plaintiff's Petition to Vacate was filed May 27, 2004.  On July 7, 2004, the case was transferred to the undersigned.  On July 14, 2004, Defendants filed a cross Petition to Confirm.

## II.  FACTS

Plaintiff-Petitioner, Ernestine F. Strobel, is a single woman in her mid-80's.  Born in 1919, Strobel went to work for the U.S. Army Corps of Engineers as a secretary in 1944. (Notice of Lodgment in Support of Petition to Vacate Arbitration Award ("Pl. NOL"), Ex. 29 at 419). Strobel eventually did drafting work for the U.S. Navy and obtained a college degree from the University of Hawaii in educational communications by attending evening classes.  (*Id.* at 420). After surviving a bout with cancer in 1976, Strobel retired in 1979.  (*Id.* at 421).  She has also been

1  an astute investor in rental real estate, using an approach of buying multi-unit dwellings, living in
2  one unit, while renting the rest. (*Id.* at 422-26). Preferring the climate, Strobel moved to San
3  Diego, California in 1990. (*Id.* at 423). In 1990, she bought a four-plex in Ocean Beach where
4  she lived until 1999. (*Id.* at 424-25). She also bought a four-plex in Pacific Beach in 1994 and a
5  single family residence at a county auction in 1999. (*Id.*).

6  After moving to San Diego, in 1992, Strobel opened a brokerage account with the firm of
7  Morgan Stanley Dean Witter ("Morgan Stanley"). In 1996, she left Morgan Stanley because her
8  broker had engaged in buying stocks in her account on margin without obtaining her authorization.
9  (*Id.* at 572). She went to the firm of Merrill Lynch.

10  In 1998, Strobel brought her investments back to Morgan Stanley because the Morgan
11  Stanley office was more conveniently located. (*Id.* at 450-52). There she was introduced to two
12  brokers who would handle her accounts from 1998 to 2002. The brokers were Defendant Suzanne
13  LaTour and Susan Harding. (*Id.* at 452). Strobel had two accounts at Morgan Stanley. The first
14  was the individual account from 1992, "reactivated" in 1998. The second was a charitable
15  remainder trust account opened in the year 2000, with Strobel as the Trustee.

16  Between the years 1998 and 2002, Strobel put into the individual Morgan Stanley account
17  cash and securities valued at $645,213. She paid $14,432 in account fees to Morgan Stanley. By
18  the end of the period, however, Strobel's account had lost $160,375 in value from trading
19  activities. (Petitioner's Supplemental Notice of Lodgment in Support of Petitioner's Reply ("Pl.
20  Sup. NOL"), Ex. 2).

21  Moreover, in the year 2000, her brokers suggested that Strobel sell her rental properties.
22  Strobel sold her Pacific Beach four-plex and put the proceeds into a Charitable Remainder Trust
23  and opened the second trust account with $472,246 in cash and 500 shares of Celestica, Inc. for a
24  total opening value of $498,621. By 2002, however, the value of her investments in that account
25  had also declined -- by $106,920. (Pl. Sup. NOL, Ex. 3).

26  In other words, while in the hands of Morgan Stanley and its stockbrokers LaTour and
27  Harding, Strobel's investments in the two accounts lost a total of approximately $281,000 in value.
28  (Pl. NOL, Ex. 29 at 645). During that time Strobel's individual account was heavily invested in

1 volatile technology stocks and load-bearing Morgan Stanley mutual funds.  At one point in June
2 2000, approximately 99% of the value of her account was invested in equities, and only 1% was
3 invested in cash or cash equivalents.  (*Id.* at 641).  For purposes of context, during the same time
4 frame, had Strobel's investment mix in her individual account been more conservative with 15%
5 invested in securities and 85% invested in bond funds, her individual account would have
6 increased approximately $11,000, rather than decreased $180,000.  (*Id.* at 646).

7 Strobel claims the losses are due to the failure of Defendants Morgan Stanley and LaTour
8 to understand her investment objectives, risk tolerance, and lack of sophistication, and their failure
9 to recommend appropriate investments.  Defendants remonstrate that Strobel was a sophisticated
10 investor who wanted to invest "very aggressively" and who (despite her advanced age) had a 10-
11 year investing time horizon.  The dispute went to arbitration.  The arbitrators heard testimony for
12 five days.  (*Id.* at 1-833).

13 The arbitration award held Morgan Stanley liable to pay Strobel $5,000 in compensatory
14 damages, dismissed the claim against LaTour individually and recommended expungement of all
15 references to the arbitration in her NASD records, denied Strobel's request for punitive damages,
16 ordered the parties bear their own attorney's fees, and ordered Strobel to pay $10,350 in arbitration
17 forum fees and Morgan Stanley to pay $6,900 in arbitration forum fees.  The arbitration award
18 contained no explanation for its findings.  (Pl. NOL, Ex. 6).

### III. DISCUSSION

20 A. *Timeliness*

21 Defendants first challenge the petition to vacate the Award on the basis that it is untimely
22 under the Federal Arbitration Act ("FAA").  The FAA provides that notice of a motion to vacate
23 an award must be served "within three months after the award is filed or delivered."  9 U.S.C. §
24 12.  Defendants contend that this section is "jurisdictional" and therefore must be strictly
25 construed.  However, neither the FAA itself, nor the cases cited by defendants support this
26 interpretation of the limitations period.  Defendants primarily rely upon the unpublished decision
27 in *Calabria v. Franklin Templeton Services, Inc.*, in which the district court found a petition to
28 vacate an arbitration award was untimely when it was served three days beyond the end of the

1 limitations period. *Calabria v. Franklin Templeton Services, Inc.*, No. C 01-2280 WHA, 2001 WL
2 1180466 at *4 (N.D. Cal. Sept. 26, 2001). The court in that case found that because the NASD
3 Arbitration Code allowed for the award to be served on the parties by fax, the term "received" in
4 section 12 of the FAA included receipt by fax. Nowhere in its decision does the court in *Calabria*
5 deem section 12 of the FAA "jurisdictional".

6 This Court finds that 9 U.S.C. § 12 is more appropriately viewed as a statute of limitations,
7 and therefore is subject to equitable tolling. *See Socop-Gonzales v. I.N.S.*, 272 F.3d 1176, 1188
8 (9th Cir. 2001) ("We take as our starting place the presumption, read into 'every federal statute of
9 limitation,' that filing deadlines are subject to equitable tolling.") (quoting *Holmberg v.*
10 *Armbrecht*, 327 U.S. 392 (1946)). To determine whether equitable tolling may be appropriate, the
11 Court must consider "whether congressional purpose is effectuated by tolling the statute of
12 limitations in [these] circumstances." *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 427 (1965).

13 The congressional purpose at issue in this case is the one expressed by 9 U.S.C. § 10,
14 which allows for a United States District Court to vacate an arbitration award under several narrow
15 circumstances, including fraud, corruption, partiality, or where the arbitrators exceeded their
16 powers.[1] "These grounds afford an extremely limited review authority, a limitation that is
17 designed to preserve due process but not to permit unnecessary public intrusion into private
18 arbitration procedures." *Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*, 341 F.3d 987,
19 998 (9th Cir. 2003) (en banc). It is this balance between the policy favoring the finality of
20 arbitration awards and the preservation of due process that the court must consider when deciding
21 whether to equitably toll the limitations period.

---

[1] 9 U.S.C. § 10 states in relevant part:
Same; vacation; grounds; rehearing
(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
(1) where the award was procured by corruption, fraud, or undue means;
(2) where there was evident partiality or corruption in the arbitrators, or either of them;
(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

1       In this case, plaintiff's counsel received the arbitration award by fax "on or about February 20, 2004". (Declaration of Jeffrey P. Lendrum in Support of Petition to Vacate Arbitration Award ("Lendrum Decl.") ¶ 13). Plaintiff herself received it on or about February 26, 2004. (Reply Declaration of Ernestine F. Strobel in Support of Petitioner's Petition to Vacate Arbitration Award or Alternatively to Remand for Clarification ("Strobel Reply Decl.") ¶2). The petition to vacate the award was filed on May 27, 2004, seven days after defendants claim that the three-month deadline expired.

      The first question the Court must answer is when plaintiff received the award, for purposes of starting the clock on the statute of limitations. As noted in *Calabria v. Franklin Templeton Services, Inc.*, 2001 WL 1180466 at *4, Rule 10330 of the NASD Code of Arbitration allows for delivery by fax to a party's counsel. Therefore, plaintiff received the award on or about February 20, 2004, when her counsel received it by fax. (Lendrum Decl. ¶ 13). The statute of limitations therefore would have run out on May 20, 2004, three months after plaintiff's counsel received the award, and seven days before plaintiff filed her petition to vacate.

      However, plaintiff sets forth several facts which the Court believes mitigate in favor of equitable tolling. The most important of these facts is that she was hospitalized for psychological treatment for 6 days during the time that the clock was running. (Strobel Reply Decl. ¶3). She also asserts that the hospitalization was a direct result of the receipt of the award, and she had difficulty making any decisions due to psychological difficulties even after her release from inpatient treatment. (*Id.*). The Court finds that these facts are sufficient to allow for equitable tolling, and that the defendant suffered no prejudice by the brief seven-day delay in filing the petition to vacate. "Where the danger of prejudice to the defendant is absent, and the interests of justice so require, equitable tolling of the limitations period may be appropriate." *Azer v. Connell*, 306 F.3d 930, 936 (9th Cir. 2002); *see also Stoll v. Runyon,* 165 F.3d 1238, 1242 (9th Cir.1999) (holding inability to comply with Title VII filing deadline due to psychiatric incapacity to be cause for equitable tolling). Plaintiff's petition to vacate is hereby deemed timely.

      B.    *The Arbitration Award*

      An arbitration award may be vacated by the district court when it meets one of the

conditions prescribed in the FAA, 9 U.S.C. § 10:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10. The plaintiff bases her petition on two separate theories: (1) the alleged partiality of the chairperson of the arbitration panel; and (2) the award was in manifest disregard of the law.

    1.    *Evident Partiality*

The first of these falls clearly under the second ground listed in the FAA - evident partiality of the arbitrator. Plaintiff claims that the chairperson failed to disclose required information on his Arbitrator Disclosure Checklist, specifically, his involvement as a plaintiff in a lawsuit against an accounting firm in 1988. Plaintiff cites the following questions from the Arbitrator Disclosure Checklist as being "of particular importance":

> (9) Have you ever, as a party to an arbitration or litigation, named a brokerage firm, or been named by a brokerage firm in any civil lawsuit or arbitration proceeding?
> (10) Have you ever been named by an investor in any civil lawsuit or arbitration proceeding?
> (12) Have any of your relatives named a brokerage firm, or been named by a brokerage firm, in any civil lawsuit or arbitration?
> (14) Have you, any member of your immediate family, close social or business associate, been involved in the last five years in a dispute involving the same subject matter as contained in the case to which you are assigned?
> (17) Has your conduct been an issue in an arbitration or litigation proceeding (other than a proceeding in which you served as an arbitrator)? For example, if your conduct as a registered representative or manager was an issue in a case, but only the broker-dealer was named as a party, your response should be "yes."

(Pl. NOL Ex. 7). The chairperson answered "no" to all of these questions. (*Id.*). After the issuance of the award, plaintiff's counsel investigated the chairperson. He discovered a lawsuit filed by the chairperson and his wife against an accounting firm in 1988. (*Id.*, Ex. 6). The lawsuit alleged accounting malpractice on the basis of failed tax shelters. (*Id.*). This does not fall within any of the questions noted by plaintiff as improperly answered on the Arbitrator Disclosure checklist. It was not a suit against a brokerage firm, nor did it involve the same subject matter as

the arbitration at issue. The Court therefore fails to see how the chairperson's disclosures were improper. Even if the accounting malpractice lawsuit could somehow be brought within the questions on the checklist, the connection is so tenuous that it does not qualify as "evident partiality" on the part of the chairperson.

### 2. *Manifest Disregard of the Law*

Plaintiff also claims that the award was rendered in manifest disregard of the law. The Ninth Circuit has held that arbitrators "exceed their powers" when the award is completely irrational or exhibits a manifest disregard of the law. *See Kyocera Corp. v. Prudential-Bache Trade Services*, 341 F.3d at 997 (internal quotations and citations omitted). Manifest disregard of the facts does not constitute a separate ground for vacatur. *Coutee v. Barrington Capital Group, L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003). However, legally dispositive facts can be so firmly established that an arbitrator can manifestly disregard the law by failing to recognize those facts. *Id.* (citing *American Postal Workers Union v. United States Postal Serv.*, 682 F.2d 1280, 1284-86 (9th Cir. 1982)).

The arbitration panel issued an award finding respondent "Morgan Stanley Dean Witter Inc. is liable to and shall pay claimant Ernestine F. Strobel, individually and as Trustee of the Strobel Charitable Remainder Unitrust Dated 11/29/00 $5,000 in compensatory damages." (Pl. NOL Ex. 4). The panel did not provide a reason for its finding of liability, nor did it explain the damage award. It also assessed forum fees in the amount of $10,350 to Strobel and $6,900 to Morgan Stanley. The Court is troubled by the severe disparity between the finding of liability and the assessment of damages.

Contrary to defendant Morgan Stanley's contention, the language quoted above does constitute a finding of liability. The fact that the panel chose not to include any factual findings in the award does not change that they held Morgan Stanley liable to Strobel. The question therefore is whether the finding of liability can be reconciled in any way with the award of damages such that it does not qualify as manifest disregard of the law. Strobel presented testimony from a damages expert who assessed her losses due to the unsuitability of investments at $281,729. (Pl. NOL Ex. 12). Morgan Stanley's expert did not dispute that amount, only whether the investments

were suitable. He did not present his own damages assessment, and agreed that Morgan Stanley's profit and loss statement showed the same numbers as those discussed by Strobel's expert. (Pl. NOL Ex. 29). Morgan Stanley's expert testified that the difference between regular losses in an account and damages would be whether there was wrongdoing in the account. (*Id.*). The panel's finding of liability is the equivalent of finding wrongdoing in relation to Strobel's account. The amount of damages sustained by Strobel is therefore undisputed.

These facts bears a striking resemblance to those presented in *Tripi v. Prudential Securities*, 303 F. Supp. 2d 349 (S.D.N.Y. 2003). In *Tripi,* the plaintiff brought a host of claims against Prudential Securities in an NASD arbitration, claiming losses of approximately $870,000. The panel issued an award finding Prudential liable to Tripi, awarding him $25,000 in compensatory damages, and assessing all forum fees against Prudential. *Id.* at 352. The panel gave no reason for its award, which amounted to approximately 3% of the losses suffered by Tripi, and when the plaintiff requested clarification, declined to give it. The court found that there was some evidence in the record to support Prudential's defenses of ratification and failure to mitigate damages, which could justify an apportionment of damages. However, it found that even given that, the evidence of Prudential's liability was so strong that an award of 3% of losses was "incomprehensible" and "shocks the conscience of this Court." *Id.* at 356. The court in *Tripi* chose to remand to the Panel with instructions to explain its allocations of damages, although it emphasized that had the decision been a jury verdict, the court would not have hesitated to set it aside.

In the instant case, the allocation of damages is similar, but there is even less in the record to support such a disproportionate damage award. Morgan Stanley's defense to the claim of unsuitability was that Strobel was wealthy and sophisticated. In support of this defense, it offered the suggestion that she didn't really save her money as a result of frugal living as a government employee, and that having survived the Depression, she understood that investing in the market held risk. (PL. NOL Ex. 2). It is well-established that wealth of the customer (however accumulated) and sophistication are not bases for recommending risky investments, nor are they defenses to claims of unsuitability. *See Arthur Joseph Lewis,* 50 S.E.C. 747, 749 (1991) ("the fact

1  that a customer . . . may be wealthy does not provide a basis for recommending risky
2  investments."); *David Joseph Dambro*, 51 S.E.C. 513, 517 (1993) ("Suitability is determined by
3  the appropriateness of the investment for the investor, not simply by whether the salesman
4  believes that the investor can afford to lost the money."); *see also Krull v. SEC,* 248 F.3d 907 (9th
5  Cir. 2001) (giving deference to the SEC's interpretation of "unsuitability" under the NASD's
6  Rules of Fair Practice) (citing *Alderman v. SEC*, 104 F.3d 285, 288 (9th Cir. 1997)).  Had the
7  arbitrators accepted these defenses in response to the claim of unsuitability, they would have been
8  in manifest disregard of the law.

9  Further, Morgan Stanley presented no calculation of damages to dispute that provided by
10 Strobel's expert.  Without evidence to the contrary, the record clearly establishes that Strobel
11 suffered a loss of $281,729, and that Morgan Stanley was liable to her for malfeasance in relation
12 to her account.  The decision to award her only $5,000 in compensatory damages, and to assess
13 forum fees against her is completely irrational and  "shocks the conscience" of this Court.  *See*
14 *Tripi* at 356.  The Court is therefore left to decide whether to vacate the award entirely, or to
15 remand to the arbitration panel for further proceedings.

16 If the Court was able, it would award Ms. Strobel the full $281,729 that the undisputed
17 evidence establishes as the amount of damages to which she is entitled.  Rather, in deference to the
18 arbitration process, and because the manifest disregard of the law is limited to the issue of
19 damages, the Court believes it to be in the interest of justice to remand with instructions to make a
20 proper damage award, in keeping with this Order.

### IV.  CONCLUSION

22 For the reasons stated above, the Court DENIES the Petition to Vacate the Arbitration
23 Award, DENIES the Cross-Petition to Confirm the Arbitration Award, and REMANDS to the
24 panel for an award of damages in keeping with the substance of this Order.

25 IT IS SO ORDERED.
26 DATED:  November 13, 2006

Hon. Roger T. Benitez
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28